# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| PROGRESSIVE NORTHERN INSURANCE COMPANY, Plaintiff, | ) ) ) ) | |
| v. | ) ) | CAUSE NO.: 3:07-CV-222-TS |
| MOVEMEANT SALES, INC., EUGENE LEWIS WEST, ELVIN ARMSTRONG, ALBERT MURPHY, LEONARD WESTBROOKE, MIKE WILSON, ANGELINA MASON, THEOTUS FLETCHER, MARK COWELLS, ERIC BROWN, ANDRE VALREI, Defendants. | ) ) ) ) ) ) ) ) ) ) ) | |
| ——————————————— | ) ) | |
| ELVIN ARMSTRONG, Counterclaimant, | ) ) ) | |
| v. | ) ) | |
| PROGRESSIVE NORTHERN INSURANCE COMPANY, Counter-Defendant. | ) ) ) | |
| ——————————————— | ) ) | |
| ELVIN ARMSTRONG, Counterclaimant, | ) ) ) | |
| v. | ) ) ) | |
| MOVEMEANT SALES, INC., | ) ) | |
| Cross-Claim Defendant. | ) | |

## OPINION AND ORDER

In the early morning hours of February 13, 2005, a van owned by Defendant Movemeant

Sales, Inc., and insured under a commercial automobile liability insurance policy issued by

Plaintiff, Counter-Defendant Progressive Northern Insurance Company, was involved in an accident. The driver and passengers of the van were sales persons for Movemeant Sales. The issue before this Court on cross motions for summary judgment [DE 48, 60] is whether the insurance policy provides coverage for the accident, or whether certain exclusions to coverage apply. Progressive contends that the accident is excluded from coverage because the sales representatives involved in the accident were employees of Movemeant Sales, the accident arose out of and in the course of their employment, and the injuries are compensable under worker's compensation laws. Movemeant Sales argues that the magazine sales representatives involved in the accident were independent contractors, that the employee exclusion provision cited by Progressive does not apply, and that Progressive should be held to its obligations under the insurance policy. Elvin Armstrong, a van passenger who sustained injuries in the accident, opposes Progressive's Motion for Summary Judgment on grounds that a jury could determine that he was an independent contractor or, alternatively, that even if he was an employee he was not acting in the course of his employment when he was injured in the accident.

## BACKGROUND

This is an action for declaratory relief brought pursuant to Federal Rule of Civil Procedure 57 and Indiana Code § 34-14-1-1 *et seq.* In its Amended Complaint for Declaratory Relief [DE 32], Progressive requests a declaration that the Defendants are excluded from coverage under its policy from any and all claims arising out of an accident that occurred in New Mexico on February 13, 2005, because the persons involved were the insured's employees. On October 3, 2007, Defendant Armstrong, the only individual Defendant to answer Progressive's

Complaint for Declaratory Relief, lodged a Counter-Claim against Progressive and a Cross-Complaint against Codefendants Movemeant Sales and Eugene West, who was the driver of the van. Armstrong's pleading alleges that he was an independent contractor and not an employee of Movemeant Sales, and he seeks declaratory judgment of that status.

On October 10, 2008, Progressive filed its Motion for Summary Judgment [DE 48], Brief in Support [DE 49], and Designation of Evidence [DE 50], asserting that the Defendants' claims are excluded from liability coverage because they were employees at the time of the accident and their injuries arose out of and within the course of their employment. On November 10, Armstrong filed his Response in Opposition [DE 51], and also moved to strike Progressive's Brief for exceeding the twenty-five page limit that is set in this district's rules.[1] Progressive responded to the motion to strike and moved for and was granted leave to file a brief in excess of the page limit, which it filed on November 26 [DE 58]. On December 5, Movemeant Sales filed its own Motion for Summary Judgment [DE 60] along with its Brief in Response to Progressive's Motion for Summary Judgment and Brief in Support of Movemeant's Sales' Motion for Summary Judgment [DE 59]. On December 18, Progressive filed its final brief [DE 61] in support of its Motion for Summary Judgment and in opposition to Movemeant Sales' Motion for Summary Judgment.

## STANDARD OF REVIEW

Progressive, Movemeant Sales, and Armstrong all agree that the ten factor test cited in

---

[1] The Court notes that Armstrong's own brief fails to comply with local district rules, in particular those governing font size. No motion has been made to strike his brief, and this Court fully considers the merits of Armstrong's arguments.

the Restatement (Second) of Agency § 220 (1985), and adopted by the Indiana Supreme Court in *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493 (Ind. 1995), and *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001), applies in this case to determine whether the door-to-door magazine sales persons were independent contractors or employees of Movemeant Sales. The parties also agree that, while no one factor is dispositive, the extent of control over the manner and means by which work is to be accomplished is the most important factor in determining whether a master-servant relationship exists. The parties do not agree on the proper outcome of the application of the ten-factor test to the facts of this case.

Progressive argues that, when the test is applied to the facts of this case, the only reasonable conclusion is that Movemeant Sales's representative were employees. Progressive also submits that, as a matter of law, the van driver and passengers were acting within the scope of their employment at the time of the accident, and requests that the Court enter a declaration of no coverage under the insurance policy. Using the same facts presented by Progressive, in combination with other designated facts, Movemeant Sales requests that the Court find that the sales representatives were independent contractors and order that insurance coverage exists under the policy. Armstrong argues that he is entitled to present his case to a jury because the facts "are heavily disputed," particularly those relating to the amount of control, if any, that Movemeant Sales exerted over his work. (Armstrong's Resp. 8, DE 51.)

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing

the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, opposite sides to a controversy seek a summary ruling in their favor, the court must still examine each motion while construing the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255. The party bearing the burden of proof on an issue at trial and opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In an insurance policy dispute, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Nat'l Fire and Cas. Co. v. West By and Through Norris*, 107 F.3d 531, 535 (7th Cir. 1997) (citing *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992)). Whether a worker is an employee or an independent contractor is generally a question for the finder of fact, but the court may properly determine the issue if the significant underlying facts are undisputed. *Moberly*, 757 N.E.2d at 1009. The legal conclusion to be drawn from the facts surrounding the sales representatives' relationship with Movemeant Sales are vigorously disputed. However, the facts themselves are largely undisputed. The Court must determine whether either party prevails as a matter of law when the facts are construed most favorably to the opposing party, or whether the issue must be decided by a jury.

## STATEMENT OF FACTS

### A.      Movemeant Sales's Business Model

Movemeant Sales is a sales organization in the business of selling magazine subscriptions door-to-door in residential areas. The company's principal place of business is in Michigan City,

Indiana. Robert Jackson founded Movemeant Sales to provide opportunities to young adults from urban areas to succeed at door-to-door selling. Movemeant Sales had two secretarial employees who were paid an hourly wage. All other persons involved in the company were sales persons who were paid strictly on a commission basis and issued 1099 Forms for tax purposes. Their commissions were determined on a weekly basis using the number of subscriptions they sold that week. Before a sales person began working with Movemeant Sales, they signed a document titled Independent Contractor Agreement. Jackson was identified in the Agreement as the Manager and the individual desiring to sell magazines was referred to as the Agent. The Agreement stated that the

> Agent is a [sic] INDEPENDENT CONTRACTOR. The Manager will not treat the Agent as an Employee for Federal, State and Local Tax purposes. The Agent will abide by all Federal, State and Local tax laws applicable to an independent contractor, including all estimated income and self-employment taxes, and will be solely responsible for his or her own taxes. The Agent will determine what hours he or she works. The Agent will determine the place of business and hours he or she works, but shall consult and coordinate with the Manager in these regards.
> Compensation will be a commission plus bonuses, with a guaranteed drawing account which will be taken against the commission.
> The Agent is responsible for all expenses he or she incurs in the conduct of the services rendered hereunder. Agent agrees to abide by all the laws and requirements of door-to-door solicitors in the area in which he or she operates.

(Jackson Dep. Ex. 4.) Each seller also signed a Terms of Enrollment form. The form contained a list of understandings, including:

> It is my desire and intentin [sic] to carry on the business of soliciting subcsriptions [sic] on my own account as an independent contractor and not as your employee, and accordingly I am to be personally responsible for my living expenses while working and I will comply with the conditions on the reverse of this statement.

(Jackson Dep. Ex. 4.) Included in the conditions was an explanation that the seller is an independent contractor, that he is responsible for his own taxes, that he must reimburse

Movemeant Sales for expenses, and that Movemeant Sales is not responsible for worker's compensation. Because Movemeant Sales did not provides benefits to the sales representatives, it arranged for individuals from the National Association of Self Employed to talk to them about insurance and other benefits.

Jackson advertised for sales team members in several large cities. Individuals who answered Movemeant Sales's advertisements had to be over eighteen years old and able to travel. Applicants did not need to have a certain level of education or sales experience. Applicants would use bus transportation to travel from their home city to the city where Movemeant Sales was operating at that time. After a new applicant completed his paperwork, Jackson assigned him a trainer. For the next three to five days, the new sales representative accompanied the trainer on sales calls to observe the trainer's interactions with potential customers. A team supervisor decided when a new team member appeared ready to make his own sales calls, but the trainer accompanied him for the first few calls. For the next step of independence, the new team member worked across the street from the trainer, who continued to provide advice and encouragement when needed. Finally, the new sales team member worked without a trainer nearby, with just the driver of the van acting as a supervisor throughout the day. However, when Armstrong started working for Movemeant Sales, he already had experience with two other door-to-door magazine sales companies and, based on this experience, he was allowed to begin immediately selling unsupervised and without training. Armstrong believed that he conducted his business differently than Jackson did, and that he could decline to do something that Jackson asked him to do.

Based on his own experience, Jackson selected certain areas of the country to conduct

door-to-door magazine selling. Sales representatives would travel east from the west coast in January, making sales in various states along the way. They would return to the west coast between September and October, where they made calls until the next January. During their stays in different cities, a hotel served as home base for the sales teams. Movemeant Sales arranged for transportation by passenger van and for hotel accommodations during these travels, but the sales representatives paid for both through draws against their commission. The sales representatives paid for supplies that were provided, such as magazine lists and receipts, in the same way. Movemeant Sales kept an accounting of monies earned as well as expenses that were charged to the sales representatives. Each sales person registered for their own business license or solicitor's permit in the town where they would be working.

The vans were driven by the most experienced sales persons, who acted as supervisors to the van's passengers. The drivers received 100% commission on their own sales, plus 10% of the sales made by persons riding in their van. The drivers were familiar with the cities visited and were able to offer advice and encouragement to the newer sellers. The drivers determined how long to stay in the cities selected by Jackson. The van drivers relied on their own methods to obtain directions to the neighborhoods where they wanted to sell. Jackson considered the van supervisors to be independent contractors.

At the beginning of each work day, experienced sales team members offered an optional meeting at 7:30 AM to help newer members. Jackson required sales persons to attend an hour and one-half motivational meeting beginning at 8:00 AM. Jackson also determined which team members would ride together to optimize the chemistry of the individuals working with each supervisor. A typical sales day ended at 7:00 PM, but sales team members could work later or

quit earlier. They did not keep time cards or work set hours. Each person determined when to take breaks. Armstrong, who was a successful seller, occasionally determined that he did not want to sell on a particular day and instead found a movie theater, bar, or other place to entertain himself. Although there would be an inquiry as to why he did not work, there were no repercussions or discipline imposed by Jackson or Movemeant Sales.

Jackson recommended that sales team members be conversational and tell prospective buyers their "story."  He admonished them to be truthful and to follow the law at all times. The sales receipt given to customers who made purchases stated that the order was placed by an independent contractor or salesperson. Movemeant Sales did not have any uniforms or a dress code, but team members were encouraged to dress in a manner that their grandmother would approve. Jackson enforced rules against loud noise, excessive drinking, drugs, fighting, smoking, and being in "the wrong room at the wrong time of night." (Jackson Dep. 76.)

Supervisors and more experienced sellers could elect to hold evening or morning workshops, but team members were not required to attend. The purpose of these workshops was for more experienced sellers to help new or struggling team members. Armstrong instructed other sales representatives on subjects such as speaking clearly, a firm handshake, looking a person in the eye, proper grammar, personal appearance, and other common sense matters. Armstrong was not compensated for conducting these meetings. The supervisors decided amongst themselves who would lead the instructional time.

## C.    The Insurance Policy

On December 16, 2004, Jackson wrote to a Progressive employee identifying the drivers

that he wanted to be on his company insurance policy. He described the nature of his business as a door-to-door sales of books and magazines on a subscription basis, and explained how the sales team was transported to and from the neighborhoods in which they were working. Jackson intended to obtain coverage for sales persons traveling in his vans, and believed that they were covered when he finalized the insurance contract with Progressive.

The policy that was issued excluded coverage for "[a]ny obligation for which an insured or the insurer of that insured, even if one does not exist, may be held liable under Worker's Compensation, unemployment compensation, or disability benefits or any similar law." (Am. Compl. Ex. A at 12.) The policy also excluded coverage for "[b]odily injury to an employee of an insured . . . arising out of or within the course of employment" and for "[b]odily injury to a fellow employee of an insured while within the course of their employment, except injuries for which the insured is legally liable." (*Id.*)


D.      **The Accident**

February 12, 2005, was the sales team's last day working in Phoenix, Arizona, before they would travel to San Antonio, Texas. After stopping work at around 8:00 PM, Armstrong socialized with friends and was drinking alcohol. The van left Arizona around midnight, with Eugene West driving. Armstrong was awake for a little bit, but then fell asleep. In the early morning hours West lost control of the van, causing it to crash.

Following the accident, Armstrong made a demand from Progressive to recover damages for personal injuries he sustained as a result of the accident. Progressive denied Armstrong's claim, citing the policy's employee exclusion, and filed its Complaint for Declaratory Relief.

Armstrong has asserted a counter-claim against Progressive for coverage under the policy.


**DISCUSSION**

**A.      Employee v. Independent Contractor Status**

Indiana has adopted the ten-factor test described in the Restatement (Second) of Agency § 220 to distinguish employees from independent contractors. *Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001); *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind. 1995). Under the Restatement test, a court examines: (1) the extent of control which, by agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; and (10) whether the principal is or is not in business. *Moberly*, 757 N.E.2d at 1010; *Mahaney*, 655 N.E.2d at 495. A court considers all factors, and no one factor is dispositive. *Moberly*, 757 N.E.2d at 1010; *Mahaney*, 655 N.E.2d at 496.


**1.      *Extent of Control Over Details of Work***

When an individual is answerable to another for the results only, rather than for the

particulars of how an assigned task is accomplished, this factor weighs in favor of independent contractor status. *Moberly*, 757 N.E.2d at 1011.

Progressive argues that the control factor weighs in favor of finding that the sales representatives were employees of Movemeant Sales. Progressive acknowledges that the sales representatives signed an Independent Contractor Agreement stating that the agent would determine what hours to work and the place of business, in consultation and coordination with the principal, but stresses that the agreement did not specify who had the right to control the means and methods by which sales were to be accomplished. Regarding the hours worked and location of sales, Progressive argues that, in practice, they were dictated by Movemeant Sales, as the sales representatives were required to attend a morning meeting and then boarded an assigned van with a designated supervisor to be dropped off in one section of a neighborhood and picked up in a different section later. All of this was done, Progressive notes, in a city selected by Jackson.

The Court does not find that these particular facts evidence control over the details of how the sales representatives accomplished their sales' tasks. Merely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor. *Estate of Suskovich v. Anthem Health Plans Of Va., Inc.*, 553 F.3d 559, 566 (7th Cir. 2009) (citing *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996)). "Nor is the fact that a person is required to be at a given place at a given time . . . sufficient to support an employer-employee relationship." *Id.* In one Indiana case, assigning a delivery area and deadlines for delivery of newspapers, absent other indicia of control, was not found to establish the requisite control. *Snell v. C.J. Jenkins Enters., Inc.*, 881 N.E.2d 1088, 1092 (Ind. Ct.

App. 2008). Additionally, there is evidence in the record that sales representatives could take breaks when they wanted and as often as they wanted, with only the results of their sales efforts being questioned if appropriate. Armstrong, who was a successful seller, decided not to work on particular days without consequence. Although the location of a sales person's breaks would be limited to the neighborhood where he was dropped off by the driver, this limit was a result of having no other means of transportation as opposed to a result of Jackson directing where he could go on his breaks.

Instead of focusing on when and where the team members worked (which is not particularly probative in this case), the important question is whether the details of the work they did, in this case how they sold magazine subscriptions, were controlled by Jackson and Movemeant Sales. On that front, Progressive submits that although the sales representatives were not given sales scripts, the company directed each sales representative to tell potential customers his "story," including where he was from, what he was working to achieve, and how he was using Movemeant Sales to reach his goals. This, Progressive argues, is consistent with an employee relationship because all the sales team members used the same sales technique, as taught by Movemeant Sales.

The evidence does not suggest that each sales person used the same sales technique or method, only that they were all instructed that "the best sales talk is one called the truth." (Jackson Dep. 44.) Jackson believed that when people tell their story, such as where they are from and what they are working toward, they have no problem remembering what to say because it is the truth. This type of instruction, couched in terms of a suggestion and good sales technique, and consisting of common sense advice, is no different than what any person aspiring

to be successful in sales might read in a book, hear at a seminar, or access on the internet. In fact, Armstrong was allowed to begin selling immediately after joining Movemeant Sales without training from Jackson or anyone else precisely because he already had experience with selling magazines door-to-door. Armstrong believed that he could sell magazine subscriptions using his own approach, even if it was different than Jackson's approach. These factors are consistent with a determination that Armstrong was only responsible to Jackson for his results. Jackson also emphasized to the sales team that lying was not tolerated, was against the law, and, in any event, would not prove successful. Sales representatives were expected to conduct themselves in an appropriate manner with the public. This kind of behavior is governed (i.e., controlled) by outside factors, as opposed to being a particular detail that Jackson governed because he controlled the details of the selling process.

The undisputed evidence supports the conclusion that the sales representatives were accountable to Jackson for the results of their work, but that they controlled the details of their own sales work. In fact, the structure and the stated purpose of Movemeant Sales suggests that even the results were tracked for the purpose of determining whether an individual seller was succeeding, rather than to determine whether Jackson's company was making a profit. Jackson did not expect to gain long-term customers or a client base for the benefit of Movemeant Sales. He wanted young urban people who might not otherwise have an opportunity to succeed in a job to have a chance to earn their living, and he would give a person who was not making sales a chance if they were doing other things necessary to grow. The morning meetings were intended to motivate and challenge the sales team, not to direct their work for the day. Team members were given instruction on reliable sales techniques, but were free to conduct sales in their own

way as long as they did not use deceit and did not break the law. Jackson did not select the actual houses team members approached or observe the manner in which they executed sales. The van drivers, who were simply more experienced sellers, offered encouragement throughout the day, but did not direct the details of a sales person's work. Team members were encouraged to dress in a manner that their grandmother would approve, but did not wear uniforms and were not disciplined for their attire. Although some rules were put in place by Jackson, these rules were not intended to direct and control the task of selling, but were intended to keep the sales representatives out of trouble when they were not working.

The Court finds that the control factor supports independent contractor status.

### 2.      *Occupation or Business of One Employed*

This factor examines "whether or not the one employed is engaging in a distinct occupation or business." Rest. (2d) Agency § 220(2). Armstrong argues that he was in a niche sales market, having sold magazine subscriptions door-to-door with three different companies over the course of ten years. He contends that it is not a common occupation, like retail sales, restaurant server, or general laborer, that you can easily locate by walking into a store or restaurant or by looking through the classified ad section of a newspaper. Movemeant Sales, likewise, offers that the specialization of the job weighs in favor of independent contractor status. Progressive focuses on the lack of experience or education required to become a sales person for Movemeant Sales to argue that the sales representative were not engaged in a distinct occupation.

The sales team members sold magazines door-to-door. Movemeant Sales is in the

business of selling magazines door-to-door. While there is evidence that Armstrong considered this to be his distinct occupation, there is no evidence that any of the other team members regarded door-to-door sales to be their business, or that they engaged in door-to-door sales outside of their relationship with Movemeant Sales. *See, e.g., Expressway Dodge, Inc. v. McFarland*, 766 N.E.2d 26, 31 (Ind. Ct. App. 2002) (noting in the analysis of this factor that the truck driver defendant was not engaged in a separate business but had worked exclusively for the plaintiff, which was "more consistent with employee rather than independent contractor status"); *see also Carter v. Property Owners Ins. Co.*, 846 N.E.2d 712, 720 (Ind. Ct. App. 2006) (finding that the plaintiff's work as a general laborer doing odd jobs was not a distinct occupation or business). Given the fact that young people who were generally inexperienced in sales responded to Jackson's ads, this factor weighs in favor of finding an employer-employee relationship. However, Armstrong's situation creates a genuine issue of material fact that could resolve this factor differently when the facts are viewed most favorably to him and Movemeant Sales.

**3.      *The Kind of Occupation***

This factor examines whether the work is generally done under the direction of an employer or by a specialist without supervision. *Carter v. Property Owners Ins. Co.*, 846 N.E.2d 712, 720 (Ind. Ct. App. 2006). Whether door-to-door sales are typically performed by unsupervised specialists as opposed to being employer-directed is not sufficiently addressed in the record to be particularly meaningful in this case. Movemeant Sales and Armstrong argue that it is common practice for magazine salespeople to be independent contractors. The evidence designated in support of this claim is Jackson's deposition testimony that he believed Armstrong

signed an independent contractor agreement for his previous job that was similar to the one he signed with Movemeant Sales, and that these types of contracts and arrangements are "just something I'm very familiar that the industry as a whole operates under." (Jackson Dep. 104–05.) However, no foundation was established in the record to support Jackson's purported familiarity and knowledge of the entire industry, and evidence presented on summary judgment must be based on personal knowledge. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). On the other hand, Progressive has not presented any evidence that would support a different conclusion. Its memorandum focuses on the training and supervision specific to Movemeant Sales only. Thus, this factor remains neutral for purposes of this Court's analysis.

**4.**     *Skill Required*

Unskilled labor is typically performed by employees while skilled labor is often performed by independent contractors. Rest. (2d) Agency, § 220(2), Comment i.

Specialized skill was not required to sell magazines door-to-door. Movemeant Sales required that sales representatives be at least eighteen years old and able to travel. Movemeant Sales did not require any previous sales experience and most applicants did not have college degrees. The training that Movemeant Sales offered consisted of general advice on dealing professionally with members of the public, which included potential customers. When Jackson addressed the sales team, he did not focus on developing skills needed to specialize in door-to-door sales, but strove to motivate young people and to give them skills to succeed in life.

This factor weighs in favor of an employer-employee relationship.

**5.** *Instrumentalities—Supplier of Equipment, Tools, and Work Location*

The sales representatives paid for any supplies that Movemeant Sales provided, such as a magazine title list, receipt book, and coversheet that described the company. Sellers also used their own supplies, such as a pen, paper, or calculator. The sales persons procured and paid for their own solicitors' licenses within each city. The most significant tool for the door-to-door sales representatives was their mode of transportation. Although Movemeant owned, maintained, and insured the vans used to transport the sales persons across the country and from the hotel to certain neighborhoods within a city, the cost of travel was deducted from their commission pay.

The Restatement commentary provides the following illustrations regarding the impact of the ownership of instrumentalities factor:

> P employs a salesman who agrees to give substantially his full time to the employment and who is furnished a car by the employer. On these facts it is inferred that he is a servant.
> P employs a salesman who agrees to give full time to the work but furnishes his own car, is paid by commission and can call on those whom he pleases. It is inferred that the salesman is not P's servant.

REST 2d AGENCY § 220 (1958). The facts of this case do not conform with either scenario, but they are more analogous to the second. Jackson provided the vehicles to the sales representatives, which aligns with the first scenario. However, the sales representative were required to pay for their transportation, were paid on a commission basis, and, although their work location was dictated by the city and neighborhood where they were driven, they could visit any house they desired within this geographic area, the identity of their potential customers unknown to them up until the time of contact. The sales representatives were not working to advance Jackson's company, but attempting to earn their own money through commissions they made selling magazines where ever they thought they could be successful.

Overall, this factor weighs in favor of independent contractor status.

**6.** *Length of Employment*

The length of employment varied from individual to individual. Many of the employees working at the time of the accident had been employed for two years or more, but it was common for sales representatives to stay with the company between four and five years. A long-term relationship can indicate employee status, but in order to be indicative of such status, lengthy employment also contemplates regular hours. *Moberly*, 757 N.E.2d at 1012 (deciding that, where a person worked for another over a period of four to five years but had irregular hours and non-continuous service, this factor pointed toward independent contractor status). The Restatement comment also describes a servant, or employee, as "'one who performs continuous service for another.'" *Id.* (quoting Rest. (2d) of Agency § 220(1), Comment a).

Despite the lack of any requirement that team members log or work certain hours, their hours were fairly regular, and the service was continuous for many of the team members. Therefore, this factor favors employee status.

**7.** *Method of Payment*

Payment by the hour, as opposed to by the job, is evidence of a traditional employment relationship. *Moberly*, 757 N.E.2d at 1012. Armstrong and the other sales representatives did not receive a salary or payment by the hour from Movemeant Sales and were instead compensated through commissions. Movemeant Sales treated the sales representatives, for income tax purposes, as independent contractors. They were responsible for filing any tax returns and

paying all taxes required of self-employed individuals. The parties to this suit have acknowledged that this payment arrangement is characteristic of independent contractor status, and the Court agrees.

8.      ***Regular Business of the Employer***

At first glance, it appears that the door-to-door magazine sales persons were engaged in work that is part of the regular business of Movemeant Sales, which would normally cause this factor to be in favor of employee status. However, the Court notes that the unique business model of Movemeant Sales makes this factor less indicative of the parties' relationship than it would for the typical privately owned organization that was designed to provide goods or services to consumers with the objective of generating a financial return. Arguably, the regular business of Movemeant Sales was not about selling magazines, but about creating a framework or structure whereby individuals who might not otherwise be employed could work for themselves. Movemeant Sales employed two individuals who helped Jackson maintain this structure. When Jackson started Movemeant Sales, he was not looking to create a database of customers, which might require that he employ agents to call-on the customers as he directed for the continued and ongoing development of his client base. He did not even have a product of his own to sell, instead choosing a readily available and affordable product as the means by which he would teach young people to act independently and to make an honest living. Thus, the Court does not find this factor particularly relevant to this case.

**9.** *Belief of the Parties*

Although the parties' beliefs are not determinative of master-servant relationships, they are relevant insofar as they indicate one party's assumption of control and the other party's submission to that control. *Moberly*, 757 N.E.2d at 1012–13.

It is undisputed that new team members were asked to read and sign the Independent Contract Agreement before starting work with Movemeant Sales. The Agreement provided that the sales representative would determine what hours he or she worked and would determine the place of business and hours he or she worked, but was required to consult and coordinate with Movemeant Sales in these regards. Under basic contract law, the contracting parties' intent is evidenced by the language used in the contract. *Snell v. C.J. Jenkins Enters. Inc.*, 881 N.E.2d 1088, 1093 (Ind. Ct. App. 2008). The contract, along with the tax forms, sales receipts language, and absence of employee benefits put the sales representatives on notice that Jackson believed that they were independent contractors. Jackson also treated them as such, limiting his control to choosing the geographic area for selling, designating which team members would ride together in a van, and establishing basic rules of conduct. Jackson encouraged more experienced sellers to conduct workshops for new sellers, but did not require that they do so. As discussed earlier, he provided a general framework for the sales representative to succeed, but did not direct the details of their work.

Although Progressive notes that the term independent contractor was not explained to Armstrong when he signed the Independent Contract Agreement, Progressive has not designated any evidence to suggest that any team member held beliefs contrary to those expressed in the Agreement or believed that Jackson had the right to control the details of their work. Armstrong

testified that Movemeant Sales provided the platform that allowed him to run his own business and be his own boss, and that he understood that he had to pay his own taxes and would not receive any employee benefits. He also testified that he was free not to follow direction from Jackson.

This factor weighs in favor of independent contractor status.

10.    ***Whether the Principal is a Business***

Jackson was in business as Movemeant Sales, so this factor weighs in favor of employee status.

11.    ***Conclusion Regarding Status of Sales Team Members***

Taken as a whole, the undisputed facts do not support the conclusion that the sales representatives were employees of Movemeant Sales.

When the facts are viewed most favorably to Movemeant Sales, three factors support employee status: the lack of specialized skill required; the length of employment; and the fact that Movemeant Sales is a business. Armstrong's testimony creates a material issue of fact as to whether the sales representatives were involved in a distinct business. When the facts are viewed most favorably to Progressive, four factors support employee status: the absence of a distinct occupation; the lack of specialized skill required; the length of employment; and the fact that Movemeant Sales is a business. In neither case do these factors outweigh those factors that favor independent contractor status. These include the limited control Movemeant Sales could exercise and did in fact exert over the details of the sales representatives door-to-door selling, the

commission-based method of paying the sales representatives, the requirement that sales representatives reimburse Movemeant Sales for all supplies, transportation, and lodging, and the parties' belief that they were not creating a master-servant relationship. Thus, as a matter of law, Movemeant Sales's representatives were independent contractors.

**B.       Policy Exclusions**

All three of the exclusions from liability coverage cited by Progressive depend on the sales representatives being employees of Movemeant Sales. Because there is no genuine issue of material fact that the sales representatives were independent contractors and not employees of Movemeant Sales, Progressive's claimed exclusions from liability coverage do not apply.

## CONCLUSION

For the foregoing reasons, Progressive's Motion for Summary Judgment [DE 48] is DENIED, and Movemeant Sales's Motion for Summary Judgment [DE 60] is GRANTED.

Because there is no just reason for delay, the Clerk is DIRECTED pursuant to Rule 54(b) to enter judgment declaring that coverage under the Progressive Insurance Policy Number 04590395-4 exists for the accident that occurred on February 13, 2005, and which is described in Progressive's Complaint for Declaratory Relief and in Elvin Armstrong's Counterclaim. Armstrong's cross-claims against Movemeant Sales and Eugene West remain pending.

SO ORDERED on September 28, 2009.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION